80 A.3d 222

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

David Eugene BOCCHINO.

Misc. Docket AG No. 39, Sept. Term, 2012.

Court of Appeals of Maryland.

Nov. 25, 2013.

508

JaCina N. Stanton, Asst. Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

No argument on behalf of Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, WATTS, JJ.

BARBERA, C.J.

Petitioner, the Attorney Grievance Commission, acting through Bar Counsel, filed with this Court a Petition for Disciplinary or Remedial Action against Respondent, attorney David Eugene Bocchino,[1] on September 27, 2012, pursuant to Maryland Rule 16–751(a). The Petition alleged that Respondent engaged in professional misconduct, in violation of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), in two separate client matters: his representation of Lisa and Montgomery Embrey in an automobile warranty action, and his representation of Lily Cleaves in a credit card debt collection matter. Specifically, the Petition alleged that Respondent violated MLRPC 1.1 (competence)[2]; 1.3 (diligence)[3]; 1.4(a) and (b) (communication)[4]; and 8.4(a), (c), and (d) (misconduct)[5] with respect to the Embreys, and 1.1;

---

**1.** In August of 2011, Respondent changed his last name from "Bokeno" to "Bocchino," to reflect the original Italian spelling. Although the "Bokeno" spelling is used in much of the correspondence and many of the filings in this matter, we use the current spelling.

**2.** MLRPC 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

**3.** MLRPC 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

**4.** MLRPC 1.4 provides, in relevant part:
(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
(2) keep the client reasonably informed about the status of the matter;
(3) promptly comply with reasonable requests for information; and
(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**5.** MLRPC 8.4 provides, in relevant part:

1.3; 1.4(a) and (b); 1.15(a) (safekeeping property)[6]; 5.5(a) (assistance in the unauthorized practice of law)[7]; and 8.4(a), (c), and (d) with respect to Ms. Cleaves.

On October 1, 2012, this Court designated the Honorable M. Elizabeth Bowen of the Circuit Court for Howard County ("the hearing judge") to conduct an evidentiary hearing and file written findings of fact and conclusions of law pursuant to Maryland Rules 16–752(a) and 16–757(c). Judge Bowen held the hearing on January 29, 2013. She then filed her Statement of Findings of Fact and Conclusions of Law with this Court on April 10, 2013, concluding by clear and convincing evidence that Respondent violated MLRPC 1.1; 1.3; 1.4(a) and (b); and 8.4(a), (c), and (d) with respect to the Embreys, and MLRPC 1.1; 1.3; 5.5(a); and 8.4(a) and (d) with respect to Ms. Cleaves.

---

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

＊　　＊　　＊

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice

. . . .

6. MLRPC 1.15 provides, in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created. . . .

7. MLRPC 5.5 provides, in relevant part:

(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. . . .

## I.

Based on the evidence accepted at the January 29, 2013, hearing, the hearing judge set forth the following findings of fact:

Respondent has been a member of the Bar of this Court since December 16, 1997. He practiced for a short time at a small private law firm before joining the Office of the Attorney General, where he worked for seven years until he took medical retirement. He established his own practice in 2008.

### Representation of the Embreys

In 2009, Respondent assumed an "of counsel" position at the Ohio law firm of Kahn & Associates ("Kahn"), in which he represented the firm's clients in "lemon lawsuits"[8] in Maryland. Another Kahn attorney, Christal Edwards, had filed suit on behalf of Lisa and Montgomery Embrey against General Motors ("GM") in the Circuit Court for Frederick County on August 6, 2009, alleging that the Embreys' Chevrolet malfunctioned. Kahn re-assigned the case to Respondent in September 2009, but Respondent did not enter his appearance until October 27, 2009. On October 5, 2009, the Circuit Court issued a Scheduling Order and Order for Civil Mediation setting deadlines for discovery, designation of expert witnesses, motions, and mediation.

On October 27, 2009, the same day he entered his appearance, Respondent filed a Line to Enter Change of Address from Kahn's Ohio mailing address to 205 E. 28th Street, Baltimore, MD 21218. Within a month of entering his appearance, Respondent moved his office from the 28th Street location in Baltimore to his home in Abingdon. As a result, he began to employ P.O. Box 347, Abingdon, MD 21009 as his professional mailing address.

---

8. A "lemon lawsuit" is an action brought under Maryland's Automotive Warranty Enforcement Act, codified at Maryland Code (1975, 2013 Repl.Vol.), § 14–1501 *et seq.* of the Commercial Law Article.

Respondent had not filed a second Line to Enter Change of Address with the Circuit Court. The attorney for GM in this matter, Barbara Duvall, acted as opposing counsel on numerous other unrelated cases with Respondent during this period and, as a consequence, was aware of his new mailing address. She thus addressed all correspondence in the Embreys' case to the Abingdon address and had all filings served there.

On November 13, 2009, Duvall mailed to Respondent interrogatories, a request for production of documents, and a request for admissions of fact. On December 16, 2009, the day on which responses were due, Respondent sent Duvall an email requesting an extension. Duvall consented to that request. Respondent, however, did not provide discovery by the date to which they had agreed. On January 12, 2010, Duvall sent to Respondent via email and regular mail a reminder that the extended deadline had passed, informing him that she would file a Motion to Compel Discovery if he did not provide responses by January 26, 2010. Respondent did not provide discovery, and on January 29, 2010, Duvall filed her Motion to Compel. Respondent filed no response to Duvall's motion. The Circuit Court granted the Motion to Compel on March 3, 2010, entering an order requiring an answer to discovery by March 8, 2010. Respondent never filed any discovery in the matter.

The October 5 Scheduling Order set December 12, 2009, as the deadline by which Respondent was to designate an expert witness in the Embreys' case. In a February 2, 2010, email to Duvall, Respondent admitted that he had failed to designate an expert witness in compliance with the Order. He requested an extension, to which Duvall did not acquiesce. On March 1, 2010, citing Respondent's failures to provide discovery and to designate an expert witness, GM filed a Motion for Summary Judgment. Respondent filed no opposition to the motion.

The October 5 Scheduling Order also mandated that the parties participate in mediation. Respondent and a paralegal at Duvall's law firm had corresponded over email in November

2009 and designated two mutually agreeable dates on which to schedule the mediation: March 2 and 3, 2010. The mediator sent his letter confirming March 3, 2010, as the chosen date to Christal Edwards. Respondent did not notify the Embreys of the two potential dates for the mediation and failed to confirm with Duvall's paralegal which date the mediator had selected. Neither Respondent nor the Embreys appeared at the mediation.

On March 12, 2010, Duvall filed a Motion for Sanctions, to which Respondent filed no opposition. On April 1, 2010, the Circuit Court granted the motion, dismissed the Embreys' case with prejudice, and assessed against the Embreys GM's attorney's fees and costs.

On June 7, 2010, Respondent filed a Motion to Vacate Judgment Due to Fraud, Mistake, or Irregularity. In the motion, Respondent stated that, because of his change of address, he "never received documentation of any kind from the court and only a few of Defendant's filings," and he cited this as the reason the court should vacate the dismissal.[9] He also stated in the motion that he had filed a Line to Enter Change of Address on October 27, 2010, though he filed this Line on October 27, 2009, and the address he submitted at that time was his Baltimore address. On June 24, 2010, the Circuit Court denied the motion.

When Kahn re-assigned the Embreys' case to Respondent, the firm informed Ms. Embrey and gave her Respondent's contact information. Respondent and Ms. Embrey communicated over email on October 13, 2009, regarding whether Ms. Embrey should take her car to an automobile mechanic for service, but Respondent did not contact her again until the end of January 2010. Although Ms. Embrey offered contradictory testimony about the extent of her attempts to contact Respondent during this period, Respondent testified that there was no great need for communication over those months.

---

**9.** At the hearing in this matter, Respondent admitted to having received or being aware of every pleading and paper GM filed in the case.

The hearing judge, however, found this three-month period to be a critical one, requiring client input for the purposes of responding to discovery, scheduling the court-ordered mediation, and giving an expert the opportunity to inspect the Embreys' car.

After the depositions on February 15, 2010, at which she learned that Respondent had failed to provide responses to GM's interrogatories, Ms. Embrey contacted Respondent frequently via telephone and email to request information about the status of her case. The hearing judge found that Respondent did not respond to these requests to his client's satisfaction.

Respondent admitted that he did not inform the Embreys of his failure to designate an expert witness or provide discovery, nor of GM's Motions to Compel Discovery, for Summary Judgment, and for Sanctions. He did inform Ms. Embrey that they had missed the court-ordered mediation, but later told her, incorrectly, that this was the reason her case had been dismissed. After the Circuit Court denied the Motion to Vacate, Respondent assured Ms. Embrey that he would file a Motion for Reconsideration, but he never did so.

Respondent also failed to communicate to the Embreys GM's repeated requests for a settlement demand. The hearing judge found this failure of communication to be incompetent given Respondent's acknowledgment that he did not believe the Embreys were entitled to the remedy they desired (replacement of their vehicle), and that Respondent's failure to comply with GM's discovery demands rendered his clients' case susceptible to dismissal.

Based upon these factual findings, the hearing judge concluded that Respondent violated MLRPC 1.1 (competence); 1.3 (diligence); 1.4(a) and (b) (communication); and 8.4(a), (c), and (d) (misconduct). The hearing judge explained her conclusions, as follows:

### Rule 1.1 Competence

Respondent failed to provide competent representation to the Embreys. He failed to file any answers to GM's requests for discovery, despite reminders and extensions from opposing counsel and an additional five days for compliance given by the court in the order to compel. He failed to designate an expert in compliance with the deadline in the scheduling order, despite a clear understanding that this failure would prove fatal to his clients' lemon law case. Although opposing counsel took responsibility for coordinating a mutually agreeable mediation date, Respondent failed to verify and calendar the chosen date. As a result, he and his client failed to appear for mediation. Respondent failed to answer the motions to compel, for summary judgment and for sanctions which were the inevitable result of his inaction. Respondent's failures caused the dismissal of his clients' case and the entry of an order for sanctions against them. Respondent's conduct was in violation of Rule 1.1.

### Rule 1.3 Diligence

Respondent failed to act with *any* diligence or promptness in his representation of the Embreys. Rather, his conduct was characterized by a self-defeating ineptitude and procrastination bordering on paralysis. He failed to notify the court of his current mailing address when he moved his office to Abingdon. He missed every discovery due date and court-ordered deadline. He allowed the date for designation of experts to pass without any action on his part to select or designate this crucial witness. Although the notice of the mediation session was mistakenly sent to Respondent's predecessor, a modicum of attention on Respondent's part could have avoided the failure to appear for the mediation. The Scheduling Order and Order for Civil Mediation was signed on October 5, 2009. Respondent and his opponent's paralegal narrowed the possible dates for the mediation session to two in their email exchange on November 18, 2009. The date chosen by the mediator for the mediation session was March 3, 2010. Had Respondent been working diligently to insure compliance with the October 5th Sched-

uling Order and Order for Mediation, he would have noticed that he had never received the mediation date in the ensuing three months and would have inquired of the court, the mediator, or his opponent's paralegal what date had been chosen. Given the mediator's error in misdirecting the notice, were this Respondent's only failure in the Embreys' case, it would have been excusable. In light of all the other failures to take any meaningful action on his clients' behalf, the failure to calendar and appear at the mediation session can only be regarded as another example of Respondent's neglect of the Embreys' case.

Further, Respondent failed to respond to Ms. Duvall's repeated requests for a settlement demand in November and December of 2009 and January of 2010, a request that she repeated even after Respondent's fatal failure to designate an expert to support his clients' claim. Certainly, at that juncture, settlement was Respondent's only hope to salvage any recovery for his clients, yet he failed to respond. In addition to his failure to comply with discovery, he failed to respond to GM's Motion to Compel and for Sanctions, Motion for Summary Judgment, or the second Motion for Sanctions. Even when at last he took the belated action of filing the Motion to Vacate Judgment, by waiting to file until more than thirty days after the entry of the judgment, he significantly limited the grounds on which the court could grant relief. Respondent's conduct violated Rule 1.3.

## Rule 1.4 Communication

During his representation of the Embreys, Respondent repeatedly failed to inform them of important developments in their case. He failed to inform them of GM's discovery requests and the mediation date, which then denied them the opportunity to participate in the preparation and presentation of their case. He failed to inform them of the consequences of his discovery lapses, which were the filing of the motions to compel, for sanctions and for summary judgment. He repeatedly misled Ms. Embrey with promises that he would answer the discovery. He failed to

report the missed deadline for expert designation and the impact of the loss of this crucial witness on the overall prospect for success in the case. He failed to communicate GM's multiple requests for a settlement demand. After the case was dismissed and the Motion to Vacate was denied, he failed to candidly inform Ms. Embrey that he would not seek reconsideration, but instead promised further action for six months.

As a result of Respondent's failure to provide basic information to the Embreys about the status of their case, they were unable to make informed decisions about the representation. Respondent's conduct violated Rule 1.4(a) and (b).

### Rule 8.4 Misconduct

Respondent's violations of the Maryland Lawyers' Rules of Professional Conduct establish a violation of Rule 8.4(a).

Respondent's misrepresentations to the Circuit Court for Frederick County in the Motion to Vacate Judgment due to Fraud, Mistake, or Irregularity which he filed on June 7, 2010, establish a violation of Rule 8.4(c). Respondent stated that "Plaintiff's counsel and Plaintiff never received documentation of any kind from the court and only a few of Defendant's filings." Contrary to Respondent's statement in the Motion to Vacate, Respondent stipulated that he received all of GM's discovery requests and GM's Motion to Compel and for Sanctions at his correct mailing address in Abingdon. As demonstrated by the certificates of service, GM's Motion for Summary Judgment and Motion for Sanctions were also sent to Respondent at his correct mailing address. Respondent further stated in the Motion to Vacate that he "did not become aware of the judgment and sanctions until the early part of May, 2010." Ms. Embrey's testimony that she discussed the dismissal of her case with Respondent in mid-April is corroborated by her email exchange with Respondent on April 20, 2010, in which Respondent promised to send a later email with the motion to vacate attached. Respondent also stipulated that he in-

formed Ms. Embrey of the dismissal sometime in April, 2010.

The Embreys' case was dismissed due to Respondent's complete failure to respond to any of the discovery requests or motions of his opponent. Whatever the merits of the case might have been, Respondent's dereliction of his duty to his clients was the sole reason they lost the opportunity to have their day in court. Respondent's conduct was clearly prejudicial to the administration of justice in violation of Rule 8.4(d).

### Representation of Ms. Cleaves

In April 2009, Respondent answered a Craigslist advertisement regarding the closure of the law practice of Ralph Byrd, whom this Court disbarred on April 14, 2009. *See Attorney Grievance Comm'n v. Byrd,* 408 Md. 449, 970 A.2d 870 (2009). At their first meeting Respondent learned of Byrd's disbarment, but, notwithstanding this knowledge, entered into a professional relationship with him wherein Respondent would act as counsel of record for Byrd's clients in exchange for Byrd's mentorship in the law of debt collection and Byrd's promise to refer clients to Respondent in the future. Respondent was to share in none of Byrd's fees.

On April 16, 2009, two days after his disbarment, Byrd sent a proposed retainer agreement to Lily Cleaves, who was a defendant in a credit card debt collection action brought by Pasadena Receivables, Inc. ("Pasadena"). Ms. Cleaves returned the signed retainer on April 22, 2009, agreeing to be represented by "one of our affiliated attorneys." At this time, Ms. Cleaves paid Byrd $3,000 in attorney's fees, which he deposited in his own attorney trust account.

In May 2009, Byrd obtained from Ms. Cleaves her signature on a *pro se* Demand for Jury Trial, which he subsequently filed, to transfer her case from the District Court of Maryland in Montgomery County to the Circuit Court for Montgomery County. Respondent entered his appearance in the case on June 15, 2009. Respondent never sent Ms. Cleaves a letter

notifying her that he was assuming the representation, and the two did not enter into a separate retainer agreement. Respondent testified that it was his general practice when taking over Byrd's cases to conduct a telephone conference call with Byrd and the client, during which Byrd would explain that Respondent was his "subsequent counsel." Respondent testified that he believed he had followed this practice with Ms. Cleaves. The hearing judge did not seem to credit this testimony, referring to Respondent's "vague belief" that he participated in a conference call with Ms. Cleaves.

On June 15, 2009, Respondent filed a general denial in response to Pasadena's complaint. In his answer, he did not assert the defense of lack of authority to sue in a representative capacity. Respondent later characterized this decision as one of "trial strategy." On July 15, 2009, Pasadena filed a Motion for Summary Judgment. Respondent did not file timely an opposition but did file a Motion to Excuse Late Filing, stating that he had been away on vacation.[10] This Motion to Excuse was granted. His opposition, thus accepted by the court, included an affidavit prepared by Byrd, who sent the document on his own letterhead to Ms. Cleaves for signature and had her return it to him.

Respondent's written filing raised two arguments, but at the October 20, 2009, hearing on the Motion for Summary Judgment, he attempted to raise a third. The judge hearing the motion refused to hear this third argument, as well as argument on the defense of Pasadena's lack of authority to sue in a representative capacity, treating that argument as waived because Respondent did not raise it in his answer. The judge also found that Ms. Cleaves's affidavit did not generate a genuine issue of material fact. Consequently, the Circuit Court granted summary judgment in favor of Pasadena and entered a judgment of $19,750 against Ms. Cleaves on October

---

10. Although it appears from the record that Respondent may not have been away on vacation, Bar Counsel did not allege that this statement established a violation of MLRPC 8.4(c).

26, 2009. Respondent filed a Motion for Reconsideration on November 5, 2009, but the court denied that motion.

On April 21, 2010, Respondent noted an appeal to the Court of Special Appeals. His notice of appeal, however, did not include the information report required by Maryland Rule 8–205(b). The Court of Special Appeals issued a Show Cause Order directing Respondent to file the information report or offer an explanation as to why his appeal should not be dismissed, but he did neither.[11] As a result, the Court of Special Appeals dismissed Ms. Cleaves's appeal on July 12, 2010.

When he took over Ms. Cleaves's case, Respondent did not arrange to transfer the attorney's fees she had paid to Byrd from Byrd's attorney trust account to his own. As Respondent prepared to note the appeal to the Court of Special Appeals, Byrd recognized the impropriety of drawing the filing fee from his own account and so transferred to Respondent the $190 Ms. Cleaves had sent to him for that purpose.

On November 23, 2010, the Circuit Court granted a writ of garnishment to enforce Pasadena's judgment against Ms. Cleaves. Ms. Cleaves stated in a *pro se* Motion and Declaration to Vacate Judgment she filed on March 28, 2012, that she was not aware Respondent was her attorney until her wages were garnished.

Although Respondent testified that he in no "way, shape, or form asked or allowed Mr. Byrd to practice law with" him, the hearing judge found that their correspondence during the pendency of Ms. Cleaves's case reveals that Byrd assisted Respondent in drafting and filing court documents. For example, in preparing Ms. Cleaves's Motion for Reconsideration on the evening of November 5, 2009, Respondent sent Byrd a draft via email, requesting proposed changes. Three hours later, Byrd replied to the email stating that he had

---

11. Over the course of this proceeding, Respondent offered varying testimony on the question of whether he had included the information report with the notice of appeal.

"[m]odified it a little and filed it." Although Byrd afforded Respondent no opportunity to review what he filed in the Circuit Court under Respondent's own name, Respondent did not admonish Byrd in any way for this conduct nor did he restrict Byrd's participation in the matter going forward.

Based upon these factual findings, the hearing judge concluded that Respondent violated MLRPC 1.1 (competence); 1.3 (diligence); 5.5(a) (unauthorized practice of law); and 8.4(a) and (d) (misconduct). The hearing judge explained her conclusions, as follows:

### Rule 1.1 Competence

Respondent failed to provide competent representation to Ms. Cleaves in violation of Rule 1.1. Specifically, Respondent failed to act with the requisite legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. In the Answer he filed on behalf of Ms. Cleaves, Respondent failed to raise the issue of Pasadena's authority to sue in a representative capacity by specific negative averment as required by Rule 2–323(f), thereby admitting Pasadena's ownership of Ms. Cleaves' credit account for the purpose of the collection action. Respondent deliberately chose not to raise this required negative defense in the Answer as a matter of trial strategy. As a result of Respondent's waiver of this issue, the judge refused to consider this potentially meritorious argument at the hearing on the Motion for Summary Judgment.

When Respondent appealed the judgment against Ms. Cleaves, he failed to file the information report required by Rule 8–205. Respondent's admission at his deposition that he did not know the information report was required contradicts his claim at the hearing on January 29, 2013, that he had paid careful attention to filing the brief and all related documents and that he did not know what had happened to the report. Whether due to Respondent's lack of legal knowledge of the appellate rules, or to his lack of thoroughness in preparing the appeal, his client lost the opportunity

to have the appellate court review the ruling by the trial court which Respondent claimed had been in error.

## Rule 1.3 Diligence

Respondent failed to act with diligence and promptness in representing Ms. Cleaves in violation of Rule 1.3. The Dismissal Order from the Court of Special Appeals specifically refers to an earlier show cause order issued on June 21, 2010, which directed Respondent to file the necessary information report by July 6, 2010, or show cause in writing why the appeal should not be dismissed. In effect, this June 21st order gave Respondent an extension until July 6, 2010, to file the information report which had actually been due on May 3, 2010. Respondent took no action and the appeal was dismissed.

\* \* \*

## Rule 5.5(a) Unauthorized Practice of Law

Respondent's willful disregard of the facts in front of him enabled Mr. Byrd to continue to function as an attorney and to retain unearned fees after his disbarment on April 14, 2009.

Respondent learned that Mr. Byrd had been disbarred when he met with Mr. Byrd the first time in April of 2009. When Respondent entered his appearance on behalf of Ms. Cleaves on June 15, 2009, he had an obligation to review the entire court file, including the Complaint and the request for jury trial. The Complaint was filed on March 10, 2009, thirty-four days before Mr. Byrd's disbarment. The only document which had been filed on behalf of Ms. Cleaves at the time of Respondent's entry was the *pro se* Demand for Jury Trial which was filed immediately after Mr. Byrd's letter on May 5, 2009, within three weeks after Mr. Byrd's disbarment and certainly after Respondent's initial meeting with Mr. Byrd. This information alone was sufficient for Respondent to conclude as an attorney and as an officer of the court that Mr. Byrd had not earned the full fee in Ms.

Cleaves' case before he was disbarred, if, indeed, he had earned any of it.

When Respondent became Ms. Cleaves' attorney, particularly in light of Mr. Byrd's disbarment, he had an affirmative duty to enter into a separate retainer agreement with Ms. Cleaves which would have made it clear to her, as the client, that Respondent (and not Mr. Byrd) was her attorney. Even in the face of evidence which showed that it was impossible for Mr. Byrd to have legitimately earned and disbursed Ms. Cleaves' full retainer at that juncture in the case, Respondent failed to demand that Mr. Byrd surrender Ms. Cleaves' payments for safekeeping in Respondent's trust account. Although Respondent testified that he "relied" on Mr. Byrd's retainer agreement with Ms. Cleaves rather than executing a separate representation agreement with her, Respondent never requested or received a copy of Mr. Byrd's retainer agreement. Had Respondent demanded a copy of Mr. Byrd's retainer agreement, he would immediately have seen that it was executed April 22, 2009, after Mr. Byrd's disbarment. Respondent also failed to fulfill his affirmative duty to his client Ms. Cleaves to inform her of her right to a refund of the payment to his disbarred predecessor and the fact that Mr. Byrd was now no longer able to represent her or to legitimately earn any of the fee which had been paid.

Despite Respondent's vague belief that he participated with Mr. Byrd in two conference calls with Ms. Cleaves, the record demonstrates that Respondent permitted Mr. Byrd to conduct all client contact, including obtaining Ms. Cleaves' signed affidavit, advising her of court outcomes and accepting her check (made payable to Mr. Byrd) for the appellate costs. The record supports Ms. Cleaves' statement in her *pro se* Motion and Declaration to Vacate Judgment, which she filed on March 28, 2012, that she "had never been contacted by Mr. Bocchino regarding [her] case." That is because Respondent permitted Mr. Byrd to perform all the functions of an attorney in terms of client contact, and to profit from that relationship by keeping Ms.

Cleaves' retainer, while Respondent simply represented her in court.

Although Respondent professed ignorance of Mr. Byrd's unauthorized practice of law, the facts were before him. As he acknowledged in testimony and as was evident in the email exchanges, Mr. Byrd still considered Ms. Cleaves to be his client and he was anxious to insert himself to direct Respondent's representation. Knowing this, Respondent nonetheless surrendered client contact to Mr. Byrd. Mr. Byrd's refusal to transfer any of the fee paid by Ms. Cleaves, his email that he had "modified and filed" the Motion for Reconsideration (an email which prompted no action on Respondent's part), the use of a fax account which continued to identify Mr. Byrd as Esquire, Mr. Byrd's acceptance of a client's check made payable to him, all put Respondent on notice that Mr. Byrd continued to conduct himself as an attorney in Ms. Cleaves' case.

Respondent testified that he did not employ Mr. Byrd in any capacity. Had he employed Mr. Byrd as his non-legal assistant, these red flags would have required immediate action to control a subordinate who had overstepped the appropriate boundary between para-legal assistance and the practice of law. Respondent described a relationship in which Mr. Byrd was the mentor and Respondent was the apprentice. The facts of this case establish by clear and convincing evidence that Mr. Byrd was continuing to prac- tice law through Respondent, by drafting, modifying and signing court documents in Respondent's name, by conduct- ing all client contact through which information was given and legal counsel was provided, and by retaining all fees for those services, fees which could not possibly have been earned until after the date of Mr. Byrd's disbarment.

Although Respondent received over thirty cases from Mr. Byrd, Mr. Byrd retained control of the cases and possession of the files until they required action that only an attorney in good standing could provide, such as a court appearance or a signature on discovery or a motion. Respondent testified that "what Mr. Byrd may or may not have been

doing with his clients/former clients, I don't know. I have my suspicions but that is not something I would be willing to testify to in court." Respondent opined that it was not his job, but the Attorney Grievance Commission's, to police Mr. Byrd's conduct. In fact, however, Respondent's willingness to step into each case when some crucial juncture was reached, rather than assuming responsibility for all of the cases shortly after Mr. Byrd's disbarment, allowed Mr. Byrd to practice law, not with his own license, but with Respondent's.

Respondent's conduct violated Rule 5.5(a).

### Rule 8.4 Misconduct

Respondent's violations of the Maryland Lawyers' Rules of Professional Conduct, both directly and through the acts of Mr. Byrd, constitute a violation of Rule 8.4(a) and Respondent is, therefore, in violation of Rule 8.4(a).

Respondent failed in his duty to inform Ms. Cleaves of her right to a refund of the unearned retainer held by Mr. Byrd, to execute a separate representation agreement with Ms. Cleaves so that she would have a clear understanding of who was (and who was not) her attorney, and to require Mr. Byrd to transfer the unearned funds to Respondent's trust account. His failure to follow basic rules of procedure in properly asserting Ms. Cleaves' negative defense to the collection action and in filing the information report eliminated Ms. Cleaves' opportunity for a full evidentiary hearing at the trial level and for consideration of her appeal on the merits thereafter. Respondent not only enabled, but relied on Mr. Byrd in his unauthorized practice of law. Respondent's conduct was prejudicial to the administration of justice in violation of Rule 8.4(d).

The hearing judge did not sustain Petitioner's allegations of violations of 1.4 and 1.15. She explained her conclusions, as follows:

### Rule 1.4 Communication

Neither Ms. Cleaves nor Mr. Byrd testified at the hearing on January 29, 2013. The Court, therefore, lacks clear and convincing evidence of the timing and content of the information Mr. Byrd conveyed to Ms. Cleaves regarding the progress of the case. Petitioner has failed to meet its burden of proof and the Court draws no conclusions of law regarding this Rule 1.4 in Ms. Cleaves' complaint.

### Rule 1.15 Safekeeping Property

This rule addresses the lawyer's obligation to safeguard a client's property that is in the lawyer's possession. The only funds or property belonging to Ms. Cleaves which Respondent had in his possession was the $190.00 she sent to Mr. Byrd in April of 2010, which was transferred to Respondent to cover costs associated with the appeal (the filing fee and the deposit on the transcript). As the appeal was filed, it would appear that these funds were used on the client's behalf for their intended purpose. The Court finds that the Petitioner has failed to meet its burden with regard to Rule 1.15.

Respondent's failure to require Mr. Byrd to transfer Ms. Cleaves' retainer into Respondent's escrow account is more properly addressed . . . under Rule 5.5(a).

*Mitigation*

As a result of his military service in the Gulf War, Respondent suffers from post-traumatic stress disorder and depression. He presented as mitigation evidence a disability report prepared in 2008 by his psychiatrist, Dr. C. William Hicks, III, who believed that, at that time, Respondent was "unable to engage productively in his work as an attorney for the State of Maryland. His diminished concentration, [an extreme lack of energy], markedly diminished motivation and poor self esteem, all would contribute to a recurrence of his poor work performance." With respect to the future, it was Dr. Hicks's "reasonable clinical expectation that if [Respondent] were to continue treatment, [he] would be able to return to gainful employment."

Respondent testified that during the period at issue in these proceedings, his "overwhelming feelings of worthlessness and helplessness" manifested themselves in "things . . . slip[ping] through the cracks." He "wouldn't correct [his mistakes]," he testified, because he "wouldn't know where to start to correct them."

The hearing judge made the following mitigation finding:

Respondent's testimony and exhibits establish by a preponderance of the evidence that he has suffered from depression, anxiety and post-traumatic stress disorder for over twenty years. These chronic conditions have contributed to his inability to perform his duties as an attorney in the past and resulted in his medical retirement from his position as an assistant attorney general in 2008. The reported symptoms of these conditions—procrastination, feelings of helplessness, inability to make decisions, avoidance of confrontation and sense of being overwhelmed—can certainly be observed in Respondent's complete neglect of the Embrey case and his dependence on Mr. Byrd in the Cleaves case.

## II.

In attorney discipline proceedings, this Court "has original and complete jurisdiction and conducts an independent review of the record." *Attorney Grievance Comm'n v. Page*, 430 Md. 602, 626, 62 A.3d 163 (2013) (citing *Attorney Grievance Comm'n v. Jarosinski*, 411 Md. 432, 448, 983 A.2d 477 (2009)). We accept the hearing judge's findings of fact as "correct unless shown to be clearly erroneous." *Attorney Grievance Comm'n v. Lara*, 418 Md. 355, 364, 14 A.3d 650 (2011) (citing *Attorney Grievance Comm'n v. Palmer*, 417 Md. 185, 205, 9 A.3d 37 (2010)). We review *de novo* the hearing judge's conclusions of law. Md. Rule 16–759(b)(1); *Page*, 430 Md. at 626, 62 A.3d 163. The ultimate decision as to whether an attorney has engaged in professional misconduct lies with this Court. *Attorney Grievance Comm'n v. Joehl*, 335 Md. 83, 88, 642 A.2d 194 (1994).

When a party files exceptions to the hearing judge's findings of fact, those exceptions will be overruled so long as the findings are not clearly erroneous. *Attorney Grievance Comm'n v. Manger*, 396 Md. 134, 146, 913 A.2d 1 (2006) (citation omitted). When a party takes exception to the hearing judge's conclusions of law, those exceptions will be overruled so long as the conclusions are supported by the facts found. *Manger*, 396 Md. at 146–47, 913 A.2d 1.

### III.

Respondent filed eight exceptions to the hearing judge's findings of fact and conclusions of law. We address these exceptions in turn.

*Exceptions Regarding Representation of the Embreys*

Respondent's first exception concerns the hearing judge's factual finding that he "incorrectly" stated in the Embreys' Motion to Vacate the date on which he filed his Line to Enter Change of Address. Respondent characterizes this error as "an obvious typographical one" that cannot support a conclusion that he attempted to mislead the Circuit Court. Insofar as Respondent challenges the hearing judge's characterization of his statement as "incorrect," this factual finding is clearly supported by the record: Respondent filed his Line to Change Address on October 27, 2009, and stated in the Motion to Vacate that he filed it on October 27, 2010. If Respondent's exception represents a challenge to the hearing judge's reliance on this incorrect statement in concluding that he made misrepresentations to the court in violation of MLRPC 8.4(c), it is not clear that the hearing judge did rely on this fact. The judge enumerated two misrepresentations Respondent made to the court in the Motion to Vacate, but did not include this statement on that list. Accordingly, this exception is overruled.

Respondent's next exceptions concern the hearing judge's conclusion that he violated MLRPC 1.4(a) and (b). Specifically, he excepts to the hearing judge's findings that he

"repeatedly failed to inform [the Embreys] of important developments in their case" and failed to "adequately respond" to Ms. Embrey's requests for information.

Respondent first contends that there was no need for him to communicate with the Embreys "for certain periods of time," but maintains that he did inform them of the pendency of discovery and discuss with them the scheduling of depositions and mediation. The record belies Respondent's assertion that he kept the Embreys apprised of significant developments in the case as they occurred. Although Respondent was not required to inform his clients of each passing pre-trial deadline, he needed to inform the Embreys of missed deadlines that carried potential adverse consequences, the action he was taking to avoid such consequences, and any negative consequences that did come to pass. His failure to observe discovery deadlines resulted in GM's filing a dispositive motion. This was a significant development in the case, but it was not until late April that Respondent informed Ms. Embrey that GM had moved for dismissal, which, by that point, the court had granted. This constitutes a failure to "keep the client reasonably informed about the status of the matter." MLRPC 1.4(a)(2). Consequently, we overrule Respondent's exception.

■ Respondent next asserts that he "did in fact respond to the client." Instead of offering support for this assertion, he attempts to shift the blame onto the client, characterizing Ms. Embrey's attempts to contact him as "border[ing] on harassment." We, however, direct our focus squarely on Respondent's conduct.

Respondent admits to refusing to speak with Ms. Embrey on the telephone. Over email he was no more responsive. After the February 15, 2010, depositions, at which she learned that Respondent had failed to provide responses to GM's interrogatories, Ms. Embrey began sending Respondent emails seeking reassurance that he was paying proper attention to her case, but he did not reply to these messages. After learning in April 2010 that the court had granted GM's

Motion to Dismiss, Ms. Embrey sent Respondent emails requesting updates on the "reinstatement" of her case, and he
answered few.[12] When Respondent did reply, often after
great delay or only upon prompting by staff at Kahn,[13] he
would pledge to send Ms. Embrey copies of court pleadings or
take certain legal action on the Embreys' behalf,[14] and he
rarely kept these promises. This conduct constitutes a failure
to "promptly comply with reasonable requests for information." MLRPC 1.4(a)(3). Accordingly, we overrule Respondent's exception.

■ Respondent further excepts to the hearing judge's
factual finding that he failed to communicate opposing counsel's requests for a settlement demand to his clients. This
finding is clearly supported by the record, chiefly Respondent's own admission that he made a deliberate decision not to
engage in settlement discussions. Respondent did not articulate this challenge as an exception to the hearing judge's legal
conclusion that his failure to convey the request for settlement
demand amounts to a violation of MLRPC 1.4. If, however,
this was his intention, we would overrule such an exception.
Though he describes his decision as a "typical defense strate-

12. Although the record does not reflect the precise number of messages
Ms. Embrey sent as compared to the number of times Respondent
answered, it is clear that the ratio is high.

13. For example, on June 1, 2010, Ms. Embrey emailed Jennifer Cholley,
Kahn's office manager, requesting advice after Respondent had failed to
provide her a copy of the Motion to Vacate, as he had promised to do
weeks earlier. Cholley forwarded the email to Respondent along with
the message "David, please let me know what is going on." On June 3,
2010, Respondent sent Ms. Embrey a copy of the motion.

14. After the Circuit Court denied the Motion to Vacate, Respondent
indicated to Ms. Embrey that he would file a Motion for Reconsideration. On October 12, 2010, Respondent told Ms. Embrey he "should
have the motion done by the end of the week." In fact, Respondent did
not believe it was advisable to file the motion, as it would expose the
Embreys to the risk that GM would seek to enforce the sanctions the
court had ordered against them. It was not until January 11, 2011,
when Ms. Embrey stated that she would file a complaint with the
Attorney Grievance Commission if he did not respond, that Respondent
first alerted her to this possibility.

gy in litigation," his failure to relay to his clients GM's request regarding settlement implicates the Embreys' ability to "make informed decisions regarding the representation." MLRPC 1.4(b). It may well have been a valid strategy not to present to GM the amount for which the Embreys would have settled their lawsuit, but Respondent was duty-bound to inform his clients that GM sought to engage in settlement negotiations. We therefore overrule this exception.

Respondent's fifth and sixth exceptions concern the hearing judge's legal conclusion that he violated MLRPC 8.4(c). He first excepts to the hearing judge's conclusion that he made a misrepresentation to the court when he stated in his Motion to Vacate that he "never received documentation of any kind from the court and only a few of Defendant's filings." Respondent claims that this statement was "a truthful one." Because he failed to file a Line notifying the court of his Abingdon address, despite his mistaken belief that he or Kahn had done so, all court notices went to his Baltimore address and needed to be forwarded by the Postal Service. He therefore claims he "received none of them in a timely fashion." Similarly, while GM sent communications to his Abingdon address, he claims he did not receive these in a timely manner either.

The hearing judge correctly concluded that this was a false representation in violation of MLRPC 8.4(c). Respondent stated in the Motion to Vacate that he "never" received court documents. He now asserts in his exceptions that he received none of them "in a timely fashion." Respondent further stated in the Motion to Vacate that he received "only a few of Defendant's filings," but admitted during this attorney discipline proceeding that he was aware of every pleading GM filed. The record reflects that Respondent knew of each deadline in the Embreys' case. His language in the Motion to Vacate, however, suggests to the court that he did not comply with the Scheduling Order because the inefficiency of the Postal Service left him unaware of his obligations. This amounts to misrepresentation.

■ Respondent next excepts to the hearing judge's conclusion that he made a misrepresentation to the court when he stated in the Motion to Vacate that he did not become aware of the dismissal of his clients' case until May 2010. He now states that the date on which he became aware of the judgment is "unknown," and argues that the hearing judge should not have viewed this "failure to recall the exact timing" as an attempt to mislead the court. Respondent's own correspondence, however, demonstrates that he knew of the judgment on April 20, 2010, at the latest. Whether a "failure to recall the exact timing" or "an attempt to mislead the court," his statement about the date on which he became aware of the dismissal is a misrepresentation. Consequently, we overrule Respondent's exceptions and sustain the hearing judge's conclusion that he violated MLRPC 8.4(c).

### Exceptions Regarding Representation of Ms. Cleaves

■ Respondent's seventh exception concerns the hearing judge's factual finding that Byrd conducted all client contact in Respondent's representation of Ms. Cleaves. Specifically, Respondent challenges the hearing judge's partial reliance upon Ms. Cleaves's statement in her *pro se* Motion and Declaration to Vacate that she "had never been contacted by Mr. Bocchino." Ms. Cleaves did not testify at Respondent's hearing, and Respondent argues that the hearing judge's acceptance of her statement in the absence of an opportunity for cross-examination violates his due process rights.

Even without Ms. Cleaves's motion, the record supports a finding that Byrd did conduct all client contact in this matter. At his deposition in these proceedings, when Bar Counsel asked whether he had informed Ms. Cleaves in writing that he would be acting as Byrd's subsequent counsel, Respondent testified,

No, I did not. I did not write to her to tell her that. . . . I'll just describe what generally happened because I don't recall what happened in any specific case because obviously we're talking about events that occurred quite some time ago. But what generally happened is . . . Mr. Byrd would come

to my office and he and I would have a conference call with the client where he would explain that I was going to be subsequent counsel because he was no longer able to prosecute cases in Maryland courts.

When Bar Counsel asked whether such a conference call took place with Ms. Cleaves, Respondent testified, "I believe it did, but I can't say with 100 percent certainty that we did that, but that was almost always what we did, so I'm assuming that we did also do that with Ms. Cleaves, yes."

Yet, after Respondent entered his appearance, Ms. Cleaves continued to communicate with Byrd concerning her case. When an affidavit was necessary to accompany a Circuit Court pleading, Byrd, not Respondent, contacted Ms. Cleaves to obtain her signature. Later, she sent the amount of the Court of Special Appeals filing fee to Byrd, not Respondent, who, as the attorney of record, would pay the filing fee out of his attorney trust account. Finally, when she was considering filing a complaint against Respondent with the Attorney Grievance Commission, Ms. Cleaves still chose to convey this information to Byrd, not Respondent. Based on this record, it was not clear error for the hearing judge to find that Byrd conducted all client contact, and Respondent's exception is thus overruled.

Finally, Respondent excepts to the hearing judge's legal conclusion that he assisted Byrd in the unauthorized practice of law, in violation of MLRPC 5.5(a). The hearing judge found that, upon entering his appearance, Respondent should have reviewed the file in Ms. Cleaves's case, which would have led him to the conclusion that Byrd had not earned any fees in the case prior to his disbarment. It was Respondent's "willful disregard of the facts in front of him," the hearing judge stated, that allowed Byrd "to continue to function as an attorney." Respondent argues that it is "unfair and unreasonable ... to hold [him] responsible" for Byrd's conduct prior to the moment when Respondent entered his appearance in Ms. Cleaves's case. He contends that he did not allow Byrd to continue to practice law.

 The record reveals that Respondent indeed assisted Byrd in his unauthorized practice of the law. "The goal of the unauthorized practice statute is achieved, in general, by emphasizing the insulation of the unlicensed person from the public and from tribunals such as courts...." *In re Application of R.G.S.*, 312 Md. 626, 638, 541 A.2d 977 (1988). To the extent it was within his power, Respondent failed to insulate either the court or Ms. Cleaves from Byrd.

Essentially, Respondent allowed Byrd to practice in the Circuit Court under Respondent's license. After Pasadena filed its Motion for Summary Judgment, Respondent emailed Byrd on August 6, 2009, requesting a template of a memorandum in opposition, stating "I can do the drafting on the motion." Byrd replied, "I will prepare it and file it." Respondent presented no evidence that he instructed Byrd not to do so, and this type of conduct recurred. After the court granted summary judgment in favor of Pasadena, Byrd directed Respondent in an email which arguments he should include in the Motion for Reconsideration. Respondent drafted the motion and sent it to Byrd that night, along with the message, "Take a look at what I've written and see if it makes sense to you. Get back to me if you think it needs modification or change." Instead of responding with suggestions, Byrd replied, "Modified it a little and filed it." Respondent presented no evidence that he reproached Byrd for taking this action. He thus allowed Byrd to draft, edit, and file pleadings submitted under Respondent's name.

With respect to the client, Respondent stood by as Byrd held himself out to Ms. Cleaves as her attorney. Respondent did not enter into a separate retainer agreement with Ms. Cleaves, and Byrd continued to conduct all client contact, as discussed *supra*. These facts support the conclusion that Respondent assisted Byrd in his unauthorized practice of law, in violation of MLRPC 5.5(a), and we therefore overrule Respondent's eighth and final exception.

Having determined that the hearing judge's findings of fact were supported by clear and convincing evidence and that her

resulting conclusions of law are supported by those facts, we conclude that Respondent violated MLRPC 1.1, 1.3, 1.4(a) and (b), and 8.4(a), (c), and (d) with respect to the Embreys, and 1.1, 1.3, 5.5(a), and 8.4(a) and (d) with respect to Ms. Cleaves.

IV.

We now turn to the sanction for Respondent's professional misconduct. Maryland Rule 16–759(c) lists the dispositions the Court of Appeals may order: "(1) disbarment, (2) suspension, (3) reprimand, (4) inactive status, (5) dismissal of the disciplinary or remedial action, or (6) a remand for further proceedings." Petitioner recommends, pursuant to Maryland Rule 16–758(b), indefinite suspension as the proper sanction in the present case, citing the proposition that while persistent client neglect may be grounds for disbarment, if such conduct is committed by an attorney suffering from a disability, a lesser sanction may be warranted. Respondent recommends a public reprimand, along with a practice monitor and "periodic reports of his psychiatric conditions to Bar Counsel from his service providers."

In determining the appropriate sanction, we bear in mind that the purpose of a sanction is not to punish the delinquent attorney, but to protect the public's confidence in the legal profession. *Attorney Grievance Comm'n v. Zimmerman,* 428 Md. 119, 144, 50 A.3d 1205 (2012); *see also Attorney Grievance Comm'n v. Bleecker,* 414 Md. 147, 176, 994 A.2d 928 (2010). "The severity of the sanction depends on the circumstances of each case, the intent with which the acts were committed, the gravity, nature and effect of the violations, and any mitigating factors." *Attorney Grievance Comm'n v. Ward,* 394 Md. 1, 33, 904 A.2d 477 (2006) (citing *Attorney Grievance Comm'n v. Parker,* 389 Md. 142, 155, 884 A.2d 104 (2005)).

### *The Nature of the Misconduct*

The gravamen of Respondent's misconduct is his incompetence, lack of diligence, and failure to communicate with

his clients. "[L]ack of communication with one's client, for whatever reason, is a matter of continuing concern to the public. Moreover, this Court has consistently regarded neglect and inattentiveness to a client's interests to be [an ethical violation] warranting the imposition of some disciplinary sanction." *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 76, 753 A.2d 17 (2000) (quoting *Attorney Grievance Comm'n v. Montgomery*, 296 Md. 113, 120, 460 A.2d 597 (1983)). Indeed, this Court takes a dim view of such conduct:

> It is clear ... that willful and flagrant neglect of a client's affairs is, in and of itself, the kind of misconduct by an attorney which can lead to disbarment. As is obvious, the nature and persistence of this kind of inattention may and does vary. Sometimes it is generated by an outside stimulus amounting to a physical or mental disability which upon proper treatment can be overcome. In such cases this Court has not been reluctant to impose indefinite suspension and to reinstate when the Court has been satisfied that the disability has been overcome or by other means removed.
>
> In recent years, however, we have noticed too many instances when lawyers have agreed to represent clients and accepted fees, in part or in whole,[15] only to completely neglect these same legal problems, causing the same clients emotional distress, financial loss, or other varying kinds of inconvenience. More often than not, these situations have been exacerbated by the lack of respect and attention extended to the courts as evidenced by the failure to file timely pleadings or to make appearances as scheduled before the court to enable proceedings to be conducted. It seems to us that this kind of persistent conduct is evidence of a lawyer's disregard of his obligation.

*Attorney Grievance Comm'n v. Manning*, 318 Md. 697, 704–05 [569 A.2d 1250] (1990) (quoted in *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 291–92 [793 A.2d 535] (2002)).

---

**15.** Petitioner did not make any allegation that Respondent improperly accepted fees.

Respondent violated other of his professional duties, also. "Candor and truthfulness are two of the most important moral character traits of a lawyer." *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 449, 635 A.2d 1315 (1994). For that reason, "[c]onduct involving fraud, dishonesty, or deceit will ordinarily result in disbarment." *Attorney Grievance Comm'n v. Ross,* 428 Md. 50, 86, 50 A.3d 1166 (2012) (citing *Attorney Grievance Comm'n v. Keiner,* 421 Md. 492, 523, 27 A.3d 153 (2011)). Dishonesty is not the flagship violation in Respondent's case, however. Although he did make misrepresentations to the Circuit Court for Frederick County in the Motion to Vacate he filed on behalf of the Embreys, Respondent did not engage in a "pattern of . . . deceitful conduct over an extensive period of time." *Attorney Grievance Comm'n v. Lane,* 367 Md. 633, 647, 790 A.2d 621 (2002) (holding that disbarment was the appropriate sanction for an attorney's "repeated material misrepresentations").

Finally, Respondent violated his duty not to assist in the unauthorized practice of law.

Lawyers are not suspended or disbarred capriciously, for less than compelling reasons. When they are suspended or disbarred, they may not practice law except under [limited circumstances]. Members of the Maryland bar have their own duty under MLRPC not to assist suspended or disbarred lawyers in making a sham of the suspension or disbarment. We take that duty equally seriously.

*Attorney Grievance Comm'n v. Brennan,* 350 Md. 489, 501–02, 714 A.2d 157 (1998) (Wilner, J.).

### Mitigation

We have found that mitigation includes the following: absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation;

physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Attorney Grievance Comm'n v. West,* 378 Md. 395, 412–13, 836 A.2d 588 (2003) (quoting *Attorney Grievance Comm'n v. Thompson,* 367 Md. 315, 330, 786 A.2d 763 (2001)).

▆▆ The hearing judge found that Respondent suffered from depression, anxiety, and post-traumatic stress disorder while representing his clients in these matters. In cases where there has been a finding that the attorney suffered from a serious mental or physical illness, this Court "rarely impose[s] the ultimate sanction of disbarment absent misappropriation of funds. The weight we accord to a physical or mental illness depends in part on whether the condition was causally related to the attorney's misconduct...." *West,* 378 Md. at 417, 836 A.2d 588. As we are in agreement with the hearing judge that Respondent's mitigation evidence "helps to explain [his] failures," we do not believe disbarment to be the appropriate sanction for Respondent's misconduct. Instead, we determine that indefinite suspension is the more appropriate sanction for Respondent's violations of the Maryland Lawyers' Rules of Professional Conduct.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST DAVID EUGENE BOCCHINO.**